Mary Ann Dugan, Plaintiff's Appellant Mary Ann Dugan, Plaintiff's Appellant 13-35827, Soda Mtn v. BLM On December 11, 2013, Mr. Garitsma, the BLM spokesperson, said that the adjacent Cottonwood sale was marked five years ago. That was his words, which would have put the marking of that sale back in 2008. That was two years before the scoping process, as it's called in NEPA, for this sale, the Samson Cove sale, even began. Do you have a document reference from that case, in case someone wanted to find it? I do not, and I apologize. I'd be happy to- The status of the related case? It has settled. It has closed, that case. So it's settled. Some of it was logged. Some of that area was logged, but the case is closed. Did our court ever issue any kind of decision in that related case? Yes. On appeal, we had two appeals. One was the appeal on the preliminary injunction denial, and the court issued an order in that case. And then we appealed on the merits, and while the case was pending, we settled. Okay. So we did not issue a memorandum on the merits or an opinion on the merits? And I'm sorry, it's been many- That's okay. It's taken two years for this case to get to argument, and unfortunately- Okay. I just don't want to misspeak, but- That's all right. I'll check. And there were several different decisions at various points. So in 2008 or thereabouts, the Cottonwood sale was certainly contemplated. Not only that, according to Mr. Garitsma, the units were marked. Two years later in 2010, January 27th of 2010, and this is in the record ER 339, the interdisciplinary team for the BLM discussed many timber sales, including the Sampson and Cottonwood timber sales, and talked about spreading them out over a period of a couple of years. So the BLM's argument, as I understand it, I saw in the record only two items referring to the Cottonwood EA. One was the Ashland IDT meeting in January 2010. The other, in the record, I saw it was an agenda for a Cottonwood IDT meeting June 30th, 2010. Correct. And what I understood the BLM's argument to be is, well, we had a name, Cottonwood, and we knew there was going to be some timber sale or some activity thinning somewhere in a very large 45,000 acre. But the project details were so indistinct at that point that it couldn't really be studied. And in looking at the agenda and trying to translate some of the shorthand, I didn't really see anything different. It seemed very preliminary. You have to do these examinations. You have to do this verification. You have to figure out where the great gray owl cores are. So what evidence in the record would support the argument that the project was distinct enough to be studied? That's the BLM's argument, as I understand it. Well, so a couple of things. Number one, I do not agree that that is the appropriate test, and I'll get to that in a moment. But as I just explained, the defendant has actually admitted that the Cottonwood sale was marked. Well, I didn't see that in the record, so I don't know. I understand. Sitting here, I have no idea about that. So let's just stick with the record for now. But those two portions of the record, ER-339 and ER-112-13, certainly constitute evidence that the Cottonwood sale was reasonably foreseeable, which is the actual test set forth in this circuit. Well, it can't be reasonably foreseeable if it hasn't been identified anywhere. That's what the BLM argues. Well, it's certainly identified, not only by name, but they start talking about where these units are going to be. They talk about confusion between overlapping units at some point when they're talking about the Swinning sale. Sorry, let me find that. That's ER-128. They're talking about all these sales that are being planned at the same time, and they just made a decision to spread them out. That doesn't mean that they didn't have information as to where they were planning on logging. Well, I don't see it in the record. So that seemed to support what BLM was saying. So that was my confusion. Well, with due respect, Your Honor, I don't think the BLM just comes up with a name and then throws a dart at a map. They decide that they are planning sales. They start figuring out when they're going to put them up for sale, for bid. And then, you know, they start pinning down the units, the actual units. But they do know the geographic area where they're going to be. So they say no. They say it's somewhere in a 45,000-acre area. And so what you're telling me is based on your own inference and experience that that's incorrect, their statement? No, Your Honor. I think that it's not just an inference based on my personal experience. I think that the reasonable interpretation of all of the data in the record, as the magistrate found, is that the Cottonwood sale was, quote, certainly in the planning stages at the time the Samson Cove planning was going on. The standard that this court set forth in the Northern Plains case in 2012 is that when another project is, quote, reasonably foreseeable, and that is the language from the statute, from the regulation as well, it needs to be addressed in a cumulative impacts analysis. And the Temoak, T-E-M-O-A-K tribe case in 2010, in that case this court said that knowledge of another project would be reasonably inferred by looking at government documents. So the question is whether there is a project that's reasonably foreseeable, not that all the details of that project. So let me ask you. So when they do this cumulative analysis and the scoping is not yet complete, the particulars are not yet in place, how would they conduct the cumulative analysis? Well, they know that they are planning the Cottonwood sale directly adjacent. It ends up with overlapping units. That's in the record at SCR 185. Isn't your argument, though, that, to address Dr. Baez's point, you could in that instance, if you wanted to, do the cumulative impacts analysis in the later second study, but that didn't happen here either. There was a somewhat cursory cumulative analysis in the second for the Cottonwood sale in that EA. By that time, the Samson Cove EA was already in litigation, the litigation had already started. The way NEPA is supposed to work, and this Court has been very adamant about that, is it's supposed to be proactive, planning in the early stages. It's backwards to look at a sale that's already been planned, you know, later and not look at it when you know it's coming. So there's a point at which it's reasonably foreseeable. That's the correct standard. So when I was looking at our cases, I saw that a project was reasonably foreseeable if there was a timber sale of this sort, if there was a proposal, a formal proposal, a notice of intent, or I guess a third-party sale if data was published. What's the best case for you to say that a project where what we have are these agendas is reasonably foreseeable? I think those two cases I just cited, Northern Plains Resource Council 2012 and Timok Tribe 2010, are similar to this case in that there were projects that the defendant government agency chose to ignore for purposes of the earlier EA. And what phase were they in? Had a proposal been published? Was there a notice of intent? Because I didn't see any that didn't have either a proposal or a notice of intent. The Northern Plains had to do with railroad plans. It's a little difficult to find something that's on all fours, obviously. But that had to do with a report. So Northern Plains says there has to be a, let's see, a proposal exists at the stage in the development where an agency has a goal and is actively preparing to make a decision on accomplishing the goal. And so they're talking about a proposal, according to my notes here. Well, and then they explained that there was a report regarding impacts of this other project, methane project, broken down by counties about development over the next 20 years. It certainly was not at the point where they were on the ground starting to do work. Now, with a timber sale proposed by the same agency and reviewed by the same interdisciplinary team at the same time, it stretches credulity to think that there could be a situation where there's anything more reasonably foreseeable. And the magistrate- I'm still kind of interested in how they would go about conducting their announcements at this stage of the proceedings. Well, I think, Your Honor, it would be exceedingly self-serving if we could allow the BLM or the Forest Service to say, oh, we're going to give this project, this logging project, a name. We know it's adjacent to this other project, but we're not going to lay out the units yet, and therefore we don't have to look at cumulative impacts. Then there would never be cumulative impacts analysis of any foreseeable projects, only of projects that have already been issued, which goes against the plain language of the NEPA regulation, which says address past, present, and reasonably foreseeable future. So the magistrate judge, as you mentioned, did make a determination that the Cottonwood project was reasonably foreseeable. He did, and he was- It should have been included in the cumulative analysis. Correct, Your Honor. But when the district court took a look at that, the district court rejected the magistrate judge's recommendation- Correct. And cited a case called Environmental Protection- Information Center, yeah. I guess it is. Right. Why was that wrong? Well, number one, the EPIC analysis, the EPIC court, did not explicitly talk about the reasonably foreseeable standard. Second, the EPIC court basically talked about that issue in dicta, because the court then went on to say, moreover, even if U.S. Forest Service made a clear error of judgment by failing to include this project in the EA, it remedied this error, and then that's at 1014 to 15. So, in other words, the court, the EPIC court, did not provide a solid analysis of why the other project was not reasonably foreseeable. But it said it remedied this error. In the later, by fully addressing the first project in the second NEPA analysis. Now here, even if the court accepts that that's a proper way to, first of all, I don't concede that that's a proper way, because NEPA clearly says reasonably foreseeable future projects must be included in the analysis. But second, here, as explained in the brief fully, the Cottonwood EA did not adequately address the cumulative impacts of the Samson Cove EA. Regarding the second, I guess, major issue on appeal, the impacts to wilderness potential and monument potential, I would just suggest that at the time we wrote the brief, it was seven years since the wilderness checklist was written. And no update had been given, and that- But the relevant time period- And now it's nine years, that's my only point. No, but I mean the relevant, but the district court didn't make its decision this morning. I mean, the relevant time period for our purposes is four years, isn't it? And there's no case that says that four years is too long. There's a case that says that 21 years is too long. Well, the reality, though, is, Your Honors, thankfully granted a stay in this case. The logging has not yet occurred. And so the moldiness of the wilderness checklist is only getting worse as time proceeds. It is now nine years. I see that I'm into my rebuttal time, and unless you have other questions, I will come back. Thank you. Okay, that's fine. Thank you. Good morning. May it please the Court. Nina Robertson on behalf of the Bureau of Land Management. This Court should uphold the BLM's approval of the Samson Cove Project. The project takes place on 500 acres of land that are specifically designated for timber production. The project is important for forest health as it will reduce the risk of destructive wildfires and will reduce the spread of disease. And in developing the project, BLM fully complied with NEPA because it took a hard look at all of the environmental effects. The BLM also ensured that the project conforms to the Governing Resource Management Plan. Plaintiffs have raised two major issues. Unless the Court would prefer otherwise, I will start with the cumulative effects issue. The plaintiffs are correct that the test is whether or not the Cottonwood Project was reasonably foreseeable. And here, the record clearly shows that the Cottonwood Project was not reasonably foreseeable when the Samson Cove E.A. was completed. The meeting notes to which plaintiffs point to the Court do not demonstrate otherwise. In fact, what they demonstrate is the opposite, that at the time the Samson Cove E.A. was being completed, critical details about the Cottonwood Project were not known. It was not known where the project would be located, where the harvest. And I guess you would agree they were definitely contemplating the Cottonwood E.A. project. They were contemplating it. In order to spread the due dates out for more for the 2011 timber sales, we changed the specialist due dates for Cottonwood E.A. to November 2, 2010. Your Honor, we would agree that the Cottonwood Project was contemplated, but that does not mean that critical facts about the project were known. In fact, it was at such early stages that. Do you think they had any obligation to disclose in the E.A. that they were contemplating? Your Honor, that's not required. That we will address any environmental concerns in the Cottonwood E.A.? That's not required, Your Honor, and that's never been required by this Court. What the agency must do is analyze reasonably foreseeable effects. And it did so here. What are specialist due dates? What is a specialist due date? What does that mean?  As you can see, I could infer here that the specialist due date is when. I don't know what it means. No. There's no formal definition of it. Can you respond to opposing counsel's argument that BLM, in effect, conceded that in 2008 they had marked? I'm not sure what marked means. Your Honor, I can't respond to that. The plaintiffs never raised that issue in their opening brief. We have not had an opportunity to respond to it, and it's not within the record. It's completely improper for the plaintiffs to raise it before this Court, frankly. So I can't. I have not addressed that issue because it was never presented to us. But what I can tell you is that when the Sampson Co. EA was being developed, the stand assessments had not yet been done, wildlife surveys had not yet been done in the Cottonwood project, so that additional facts needed to be determined and gathered from that project area before any of its effects could be analyzed. They moved to the agenda on June 30, 2010. They've begun to identify issues with respect to Cottonwood. They've begun to identify issues, Your Honor, and they've identified work items that need to be addressed before the agency can even know about what's happening on the ground. So this is basically, Your Honor, a to-do list. It's saying we need, in order to even begin the Cottonwood EA process, we need to do all of these initial things. We need to go into the area and do additional wildlife surveys. We need to go and assess what type of civil culture prescriptions are proper here because they haven't done stand exams. And stand exams are critical before you can figure out what exactly you'll be doing. At some point there became a moment in time, I take it, in the Cottonwood project that if this issue had been decided at that point, a cumulative impacts analysis would have been required. Which issue, Your Honor? Beg your pardon? Sorry, you said if an issue had been decided. Well, the government's position is not enough had happened yet in this Cottonwood project. Correct. It was too amorphous. Mm-hmm. But some degree of planning and so forth went forward on that project, correct? Subsequent to the... Yes. So some degree of planning had taken place for the Cottonwood project. No, in the future. I'm just saying Cottonwood went forward. People continue to meet. Yes. Further civil culture analysis occurred, that sort of thing, correct? Yes, correct. Did there come a moment in time when if these two projects had been proceeding in parallel, cumulative impacts would have been required? If they had been proceeding in parallel, yes, that is completely possible. What was that point in time? The point in time, Your Honor, it proceeds on a case-by-case basis, but certainly would have to be... Yes, in this case. In this case, that overlap never occurred because... I know that. Would there have to be a proposal? My question is, you're saying it's not good enough, it's not good enough, it's not good enough, the tank's not full. What more, if we were to write a standard so that the BLM, your client, could get our guidance in the future, what would we say more needs to have happened here that didn't happen in order for cumulative impacts analysis to be required? Your Honor, I think the test is a rule of reason test. It would have to be a test that says when there is enough facts in order for the agency to conduct meaningful analysis of cumulative effects. Tell me what the facts are, please. So here, at the very least, the scoping would have to have been completed. In this case, I would say. Again, I don't think that we're not asking for a broad test to be announced here because each case, a very general test should be announced, if any, because the cases vary so much on a case-by-case basis. And again, we're asking for a rule of reason, when reasonable and meaningful analysis can be conducted of the cumulative effects. Here. What is scoping? So when you say scoping would have to be completed, what do you mean by that? So scoping, Your Honor, is defined in the NEPA regulations, and it's the process whereby the agency first announces the project to the public through a notice and asks for public input as to the general proposal that's been announced. Often that proposal is quite general, and it doesn't even define exact location of harvest units. It says we're planning a project in this particular area. Again, scoping notices vary based on project, but usually they say we're contemplating a project in this particular area. These are some possible alternatives, and we welcome public comment. So no scoping notice had gone out for government? No scoping notice had gone out. And I just wanted to point out the substance of what you just talked about is kind of reflected in these documents. Between the time those documents were, between that, the June 2010. September, wasn't it September? October. October, yes. Additional facts were gathered about the project, such that when the scoping notice for the cottonwood, yay, went out, there was more definition to the project, and it solicited input at a more specific level from the public. That scoping notice is not within the record of this case, but. BLM had made the decision itself to delay cottonwood and spread out the timber sales dates. One of my colleagues mentioned that from the agenda. And so not ascribing any ill intent to BLM, but your opponent in her argument said if you, there's a risk that you'll never do a cumulative impacts analysis if you wait for the foreseeability factors to become too robust. Isn't that sort of the danger here? There's no danger here, Your Honor. First, there, I don't, I wasn't quite clear about what plaintiff's position was on this when they just spoke to you, Your Honor. But there was definitely a cumulative effects analysis conducted in the later cottonwood EA. And that accumulative effects analysis covered the Samson Cove project specifically. Only the six acre overlap though, right? No, it covered the entire project. It discussed it, it considered the Samson Cove project as a project that needed to be considered in the cumulative effects analysis. And the EA for the cottonwood EA, which again is not before this Court, so as an initial matter we would only ask that you take notice that an EA was done in which cumulative effects of the Samson Cove project were considered. The adequacy of that EA has already been litigated and that issue is resolved. But in the reply brief, there's quotes from the cottonwood project. And the argument is that it's very, very brief. I mean, it's just virtually very little. Your Honor, that's their argument. They have had, they've litigated that EA and that issue has been resolved. So that EA, the adequacy. But you just said that, you just said in the cottonwood EA they discussed the cumulative impacts of the Samson Cove project. Right, exactly. And I think. And you're the one telling us it's adequate for this purpose. So it's not that the adequacy has been resolved somewhere else. This is your argument. Our argument, Your Honor, is that there is no risk at a basic level that the cumulative effects have escaped NEPA review. Because, in fact, there has been an EA in which the cumulative effects of the two projects was discussed, full stop. And the argument that somehow if we, in answer to Your Honor's question about whether or not this will create conditions in which certain projects, the cumulative effects of certain projects will fully escape NEPA review, that's not a warranted concern, because here we have a later EA where the cumulative effects were discussed. Second, Your Honor, there's no incentive for the agency to delay NEPA review. NEPA review takes many years, and the agency has every incentive to begin developing projects, bringing them through the NEPA process as early as possible. The agency doesn't have any real incentive to wait or delay, as plaintiffs describe it. So is the cottonwood EA part of the record in this case? Your Honor, the cottonwood EA is part of the record, and that's for the NEPA review. So if you're telling us that if we were to look at the cottonwood EA, we would see where there was a cumulative impacts analysis of the Sampson Cove project? Yes, Your Honor. We've briefed that, and there are record sites. Yes. And just as a side note, usually this is an unusual situation where we have two EAs and one record, and I just can explain to the Court why that's the case here. The Sampson Cove EA and the cottonwood EA were appealed through the internal administrative process of the BLM, through the Interior Board of Land, through the IBLA. And because during the Sampson Cove appeals process, plaintiffs raised the cottonwood issue, that became part of the record once this case was transferred to the district – once this case was before the district court. It's agency practice to include the entire IBLA appeal record in the district court record. But that's not to say that it's our position that the adequacy of the cottonwood EA is an issue presented to this Court. Again, it's been litigated in a separate lawsuit that plaintiffs filed and brought through this Court. Just turning to the case law, just to address the cases that plaintiffs rely on, the BLM at issue was proposed, and it was a railroad project where, in fact, the route had been defined. And I think here we have the opposite situation, where we don't have the equivalent of railroad routes, which is to say the exact harvest units and their location having been defined. So the facts of the cases are clearly distinguishable. In the Tame Oak case, the other project had been proposed, and in fact, the BLM had even admitted that that project was reasonably foreseeable. So we have facts that are clearly distinguishable. The cases that are on point here is the Epic case, which is almost a mirror image of this case, Your Honors. And in fact, in that case, this Court held that no meaningful analysis could be conducted, even when the other project had already been proposed. So in that case, what the Court held, and the Court was, in fact, interpreting the reasonably foreseeability test contrary to what the plaintiffs just represented, that Court found that no meaningful analysis could be conducted. So really the standard that this Court has already announced in the Epic case, in which we asked the Court to apply here, is whether or not reasonable analysis and meaningful analysis could happen of the other project at the time this E.A. was conducted. And it just simply could not. Unless the Court has further questions on the cumulative effects issue, I can turn to the National Monument question. The plaintiffs are attempting to impose a standard that simply does not exist, which is that inventories must be conducted at some regular interval that's shorter than four years. That is not the case as a general matter, and the Court should not announce such a rule here. And in fact, there has been no proposal for monument expansion. So BLM was under no obligation to include that in its NEPA analysis, and in fact, it conducted a thorough analysis of wilderness characteristics in 2006 that met all the requirements. Unless there are any further questions, I will conclude. Thank you. First of all, Your Honors, I do think it's appropriate for you to take judicial notice. FRA 201B says it can be taken at any time, and even agency documents can be, the Court can take judicial notice of. And all we are asking is for the Court to take judicial notice of something filed with this Court in a case that's related. The sufficiency and adequacy of the Cottonwood cumulative analysis, as we pointed out in the brief, was not an issue preserved below by the defendant, and it should not be entertained on appeal. But if the Court does look at that argument, as we addressed in the brief, that analysis was insufficient. There is an incentive to not mention adjacent timber sales, because as this Court pointed out in Kern v. BLM, failure to do the appropriate cumulative analysis inappropriately minimizes the appearance of the impact of an individual sale. That's the whole point of cumulative impacts analysis. Looking at the record, ER 339, which is the January ID team meeting, Botany has received all maps needed for scheduled timber sales. They had the maps. They did not have individual units fine-tuned, but then later that year How would they actually do the, I'm still back to that, how would they do it here? Well, they know a lot about the You know, I don't deal with this Sure. The law all the time, and it's, you know, every now and then we drop in on one of these cases. I have to try and understand it. Sure. Well, I mean I mean, you're saying that, well, they knew it. If you look at the agenda meeting, if you look at the, these documents, the notes, it was pretty well known, contemplated, that they were going to do this other adjacent project. Right. Timber project. Right. Okay. So they should have conducted an environmental, a cumulative environmental impact. Now looking at the whole project, looking at both projects together and evaluating all their impact on the various qualities that are, that you often see in these environmental studies. Right? Right. Given the But if they don't know, so for example, they don't know, you know, what size tree they're going to be taking in the Cottonwood project. Well, actually How do they, how do they do it? I'm trying to understand how they do it. Well, I, I don't do it myself either, but I will point out You study it all the time, right? Of course. You study this, you read it. Yes. You think about it every day. Not every day. Well, I will point out that before the Sampson EA came out in June, at the June meeting, that's ER 112, they said that they were going to do stand exams to confirm and fine tune the prescriptions and marking guidelines, field verification, stand exams. They talked about the fact that they needed to do, they had decided there were no northern spotted owl sites, but they were going to start to do the GIS project files. So GIS is where they, you know, they have these layers of information data that gets turned into maps. So they're at the phase where they're finalizing all of, they've got all the specialist reports pending, which is the botanist, the biologist, all those people are starting to feed in their information. But before that, they certainly know where the stands are, because that's what they're talking about in ER 112. We know where the stands are. They say most stands have been previously harvested. So there's no mystery about the location of the trees. They also say they're going to use the same prescriptions as another sale. So they know the prescriptions, which means, you know, how many trees are we going to leave per acre? What general size of trees are we going to cut? So they have almost all the information they need. They certainly know where it is, and they know that they're overlapping units. They're separated only by the Pacific Crest Trail. I mean, this is, there's no mystery here. Opposing counsel says that the two cases you cited were at the proposal stage. And so I'm still interested in, there is another case that where we said it was reasonable, a project was reasonably foreseeable at a preliminary stage, such as this one. Well, you know, to be honest, I think- Do you disagree with their analysis? Do you disagree with opposing counsel's analysis of those two cases? Well, I think that the early case law, which is cited in the beginning of our brief, starting at page eight, if you go back to the older cases, I think there was just a presumption that if you, if the agency knew that there was going to be another timber sale nearby, they were going to have to look at that. But there's case, abundant case law about looking at the cumulative impacts of, for example, building roads to serve a number of timber sales, like the Thomas V., I believe, Peterson case, Thomas V. Peterson, which was probably the early 90s. You know, back then there wasn't this kind of minutia of, I would call it almost gamesmanship by the federal government that, oh, well, we, you know, we've been talking about this sale, we know where the stands are, but we haven't actually issued a scoping notice yet, so it's not reasonably foreseeable. So not to overly, you know, I'm not trying to be glib, but I think that the early case law from this court about cumulative impacts analysis assumed that anything this clearly foreseeable should be included. The Kern v. BLM case is a very good overview of that. Thank you, Your Honors. And I urge you to reverse the district court and adopt the magistrate's decision on the cumulative impacts and reverse on the other issues. Thank you. Thank you, Counsel. We appreciate your arguments, Counsel. Very interesting matter submitted at this point.
judges: Tigar, Paez, Ikuta